```
 1                UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF FLORIDA
 2                 FORT LAUDERDALE DIVISION
                  CASE NO. 22-cr-80144-RS-1
 3

 4    UNITED STATES OF AMERICA,        Miami, Florida

 5             Plaintiff,              November 14, 2022

 6        vs.                         12:00 p.m. to 12:52 p.m.

 7    JOFF STENN WROY PHILOSSAINT,     Courtroom 202B

 8             Defendant.              (Pages 1 to 35)

 9    _____

                        CHANGE OF PLEA
10           BEFORE THE HONORABLE RODNEY SMITH,
                 UNITED STATES DISTRICT JUDGE
11

12    APPEARANCES:

      FOR THE GOVERNMENT:    MARC OSBORNE, ESQ.
13                           Assistant United States Attorney
                             99 Northeast Fourth Street, Suite 430
14                           Miami, FL  33132-2131
                             (561) 209-1014
15                           Marc.osborne@usdoj.gov

16    FOR THE DEFENDANT:     IAN JEREMY GOLDSTEIN, ESQ.
                             Law Offices of Ian Goldstein, P.A.
17                           330 Clematis Street, Suite 209
                             West Palm Beach, FL 33401-4602
18                           (561) 600-0950
                             Ian@iangoldsteinlaw.com
19

      REPORTED BY:           STEPHANIE A. McCARN, RPR
20                           Official Court Reporter
                             400 North Miami Avenue
21                           Thirteenth Floor
                             Miami, Florida 33128
22                           (305) 523-5518
                             Stephanie_McCarn@flsd.uscourts.gov
23

24

25
```

```
 1                       I N D E X

 2                       WITNESSES

 3
    WITNESSES FOR THE GOVERNMENT:                    Page
 4                                                    --

 5


 6
    WITNESSES FOR THE DEFENDANT:                     Page
 7                                                    --

 8
                        EXHIBITS
 9

10
    EXHIBITS IN EVIDENCE              IDENTIFIED   ADMITTED
11                                        --          --

12

13

14

15                    MISCELLANEOUS

16                                                   Page
    Proceedings....................................    3
17  Court Reporter's Certificate....................   35

18

19

20

21

22

23

24

25
```

```
1              (The following proceedings were held at 12:00 p.m.)

2              THE COURTROOM DEPUTY:  United States of America vs.

3    Joff Stenn Wroy Philossaint.  The case number is

4    22-cr-80144-Smith.

5              Counsel, please state your appearances for the record.

6              MR. OSBORNE:  Good afternoon, Your Honor.  Marc

7    Osborne on behalf of the United States.

8              MR. GOLDSTEIN:  Good afternoon, Your Honor.  Ian

9    Goldstein on behalf of Mr. Philossaint.

10             THE COURT:  All right.  Good afternoon, as well.

11             MR. GOLDSTEIN:  He's in custody.  He's here.  I saw

12   him upstairs.

13             THE COURTROOM DEPUTY:  Okay.

14      (Pause in proceedings.)

15             THE COURTROOM DEPUTY:  Should I swear the Defendant?

16             THE COURT:  Sure.

17             THE COURTROOM DEPUTY:  Okay.

18             Mr. Philossaint, please stand and raise your right

19   hand.

20      (The Defendant was sworn.)

21             THE DEFENDANT:  Yes.

22             THE COURTROOM DEPUTY:  Thank you.  You may be seated.

23             THE COURT:  All right.  Do you understand that you're

24   now under oath and if you answer any of my questions falsely,

25   all your answers may be used against you in another prosecution
```

```
1    for perjury, or for making a false statement, sir?

2            THE DEFENDANT:  Yes, Your Honor.

3            THE COURT:  All right.  What is your full name?

4            THE DEFENDANT:  Joff Stenn Wroy Philossaint.

5            THE COURT:  All right.  And have you been known by any

6    other name or alias?

7            THE DEFENDANT:  No.

8            THE COURT:  And where were you born?

9            THE DEFENDANT:  In Haiti.

10           THE COURT:  All right.  And when did you come to the

11   United States?

12           THE DEFENDANT:  January 2006 -- '16, yeah.

13           THE COURT:  All right.  And what is your date of birth

14   and age?

15           THE DEFENDANT:  March 15, 1990.

16           THE COURT:  How old are you?

17           THE DEFENDANT:  32.

18           THE COURT:  How far did you go in school and where?

19           THE DEFENDANT:  I have a master's degree in political

20   since from Haiti.

21           THE COURT:  All right.  And are you a citizen or a

22   resident?

23           THE DEFENDANT:  I'm a U.S. citizen.

24           THE COURT:  When did you become a citizen?

25           THE DEFENDANT:  I think it was beginning of 2021.
```

```
1              THE COURT:  All right.  And have you ever been treated
2    for any mental illness or addiction to alcohol or narcotic
3    drugs of any kind?
4              THE DEFENDANT:  No, Your Honor.
5              THE COURT:  Are you currently under the influence of
6    any prescription drug, narcotic medication or alcoholic
7    beverage of any kind?
8              THE DEFENDANT:  No.
9              THE COURT:  Have you taken any drugs or medication or
10   alcohol in the last 48 hours?
11             THE DEFENDANT:  No.
12             THE COURT:  Are you currently under the care or
13   treatment of any physician, psychologist or psychiatrist?
14             THE DEFENDANT:  No, Your Honor.
15             THE COURT:  Do you have a physical or mental condition
16   or illness that would prevent you from understanding what is
17   happening in court today?
18             THE DEFENDANT:  No.
19             THE COURT:  Do you understand everything that I'm
20   saying and everything that is going on here today?
21             THE DEFENDANT:  Yes, Your Honor.
22             THE COURT:  Mr. Osborne, do you agree to the
23   competency of your client -- I'm sorry.
24             Mr. Goldstein, are you confident in your client
25   entering a plea?
```

```
 1                MR. GOLDSTEIN:  Yes, sir.

 2                THE COURT:  All right.  And have you received a copy

 3      of the Indictment, Mr. Philossaint?  That is the written

 4      charges pending against you, sir.

 5                THE DEFENDANT:  Yes, Your Honor.

 6                THE COURT:  And have you fully discussed those charges

 7      and the case in general with your attorney, Mr. Goldstein?

 8                THE DEFENDANT:  Yes.

 9                THE COURT:  And have you discussed the possible

10      defense strategy with your attorney as well?

11                THE DEFENDANT:  Yes.

12                THE COURT:  And are you fully satisfied with the

13      counsel, representation and advice given to you in this case by

14      your attorney, Mr. Goldstein?

15                THE DEFENDANT:  Yes, so far, Your Honor.

16                THE COURT:  All right.  And is there anything

17      concerning your representation that you're not satisfied with?

18                THE DEFENDANT:  No.

19                THE COURT:  All right.  Because you said so far.  Is

20      there anything else that gives reason that you would not be

21      satisfied?

22                THE DEFENDANT:  I said, Yes, so far, because, you

23      know, it's an ongoing process.  But yes, everything he has done

24      so far is good.

25                THE COURT:  All right.  Fair enough.
```

1    If that's it, he's pleading guilty to which count?

2    MR. OSBORNE:  Counts 1 through 3, Your Honor.

3    THE COURT:  Counts 1, 2 and 3.

4    Count 1 -- Count 1 charges you with conspiracy to

5    commit wire fraud.  Count 2 is money laundering conspiracy.

6    Count 3 -- let me make sure I got this right -- conspiracy to

7    commit money laundering.

8    THE DEFENDANT:  Yes.

9    THE COURT:  Do you understand those charges?

10   THE DEFENDANT:  Yes, Your Honor.

11   THE COURT:  All right.  I'll ask, for the record, the

12   Government would set forth the elements of Counts 1, 2 and 3

13   respectively.

14   MR. OSBORNE:  Yes, Your Honor.  Count 1 charges

15   conspiracy to commit wire fraud.  The elements are that two or

16   more people in some way or manner agreed to accomplish a common

17   and unlawful plan to commit wire fraud as set forth in the

18   Indictment; and second, that the Defendant, knowing the

19   unlawful purpose of the plan, willfully joined in it.

20   As I say, Your Honor, the object of the conspiracy was

21   to commit wire fraud.  The Defendant's not pleading guilty to

22   that offense, but it's the object of the conspiracy.

23   In order to prove that a person committed wire fraud,

24   the Government would have to prove that the Defendant knowingly

25   devised or participated in a scheme to defraud by means of

1  false or fraudulent pretenses, representations or promises;

2  second, that the false and fraudulent pretenses,

3  representations and promises were about a material fact; third,

4  that the Defendant acted with the intent to defraud; and

5  fourth, that the Defendant transmitted by wire a communication

6  in interstate commerce to help carry out the scheme.

7          Count 2 charges the Defendant with conspiring to

8  launder money.  And the elements of that offense are, first,

9  that two or more people in some way or manner agreed to

10  accomplish a common and unlawful plan to launder money as

11  charged in the Indictment; and second, that the Defendant,

12  knowing the unlawful purpose of the plan, voluntarily joined in

13  it.

14          In Count 2, Your Honor, the object of the conspiracy

15  is violation of 18 USC 1956a(1)(B)(1).  That's one of the

16  various types of money laundering prohibited by law.

17          The elements of that offense are, first, that the

18  Defendant knowingly conducted a financial transaction; second,

19  that the Defendant knew that the transaction was made with

20  proceeds of some form of unlawful activity; third, that the

21  money was, in fact, proceeds of specified unlawful activity --

22  which in this case is wire fraud; and fourth, that the

23  transaction was designed to conceal or disguise the nature,

24  location, source, ownership or control of the proceeds.

25          Count 3 also charges the Defendant with a conspiracy

1   to commit money laundering, Your Honor, so the elements of the

2   offense are the same.   The objects of the conspiracy are

3   different.   There is two -- two objects of the conspiracy.

4        The first one is a violation of Section

5   1956a(2)(A)(1).   The elements of that offense are that the

6   Defendant knowingly -- or they would be if the Defendant were

7   charged with a substantive offense -- would be that the

8   Defendant knowingly transmitted or transferred money from a

9   place in the United States to or through a place outside the

10  United States; second, that the Defendant knew that the money

11  was proceeds of unlawful activity; third, that the money was,

12  in fact, proceeds of specified unlawful activity --

13  specifically in this case, wire fraud; and fourth, that the --

14  the transfer or transmittal was designed to conceal or disguise

15  the nature, location, source, ownership or control of the

16  proceeds.

17       The second object of the conspiracy charged in Count 3

18  is a violation of 18 United States Code Section 1957.   The

19  elements of that offense would be that, first, the Defendant

20  knowingly engaged in a monetary transaction; second, that the

21  Defendant knew that the transaction involved proceeds of some

22  form of criminal activity; third, that the transaction involved

23  money -- in this case, of a value of greater than $10,000;

24  fourth, that the money was, in fact, proceeds of specified

25  unlawful activity -- in this case, wire fraud.

1          THE COURT:  All right.

2          Mr. Goldstein, are you satisfied that that was a

3   correct statement of the elements stated by the prosecutor?

4          MR. GOLDSTEIN:  Yes, Your Honor.

5          THE COURT:  Also, would you state for the record the

6   steps that you have taken to familiarize your client with the

7   Indictment, the charges against him, and specifically Counts 1,

8   2 and 3 of the Indictment and its elements, sir?

9          MR. GOLDSTEIN:  Yes, Your Honor.  We have reviewed

10  both the original Indictment, as well as the superseding

11  Indictment.  We reviewed a lot of the -- not all of, but a lot

12  of the discovery, particularly the most damaging parts.  We

13  have reviewed the sentencing guidelines, discussed how they

14  would apply to Mr. Philossaint whether he were to go to trial

15  or to plead guilty.

16          And based upon our conversations, he had decided to

17  plead guilty to Counts, 1, 2 and 3.

18          THE COURT:  All right.

19          And is that your understanding, Mr. Philossaint?

20          THE DEFENDANT:  Yes, Your Honor.

21          THE COURT:  Now, do you understand that if you went to

22  trial, the Government would have to prove beyond a reasonable

23  doubt those elements just stated by the prosecutor?

24          THE DEFENDANT:  Yes, Your Honor, but I know what I

25  did, and I am willing to plead guilty to those charges.  And I

1    don't want the Government to spend more money on research and

2    stuff like that.

3              THE COURT:  All right.

4              Is that the forfeiture allegations in this Indictment

5    as well?

6              MR. OSBORNE:  Yes, Your Honor.

7              THE COURT:  All right.

8              Mr. Philossaint, do you understand that the Government

9    is seeking to forfeit, or take from you, the property listed in

10   the Indictment or any property derived from or used in or

11   traceable to the crimes alleged in the Indictment?

12             THE DEFENDANT:  Yes, Your Honor.

13             THE COURT:  And do you agree to forfeit to the

14   Government that property identified in the forfeiture

15   allegations of the Indictment?

16             THE DEFENDANT:  I don't think there is any property in

17   this Indictment.

18             THE COURT:  Yes.  But whether it is or not, I want to

19   know:  Do you agree to forfeit to the Government any property

20   identified in the forfeiture allegation?

21             THE DEFENDANT:  Oh, yes, Your Honor.  If there is any

22   property that I have that's derived from the illegal activity,

23   yes, they can get it.

24             THE COURT:  All right.

25             And also, there is no written plea agreement, correct?

1          MR. GOLDSTEIN:  Correct.

2          THE COURT:  The Defendant would be given -- for

3    acceptance of responsibility, they would be moving pursuant to

4    Section 3E1.1?

5          MR. GOLDSTEIN:  Yes, Your Honor.

6          THE COURT:  All right.

7          Now, would the Government please advise me of the

8    maximum penalty provided by the law and any mandatory minimum

9    penalty as well?

10          MR. OSBORNE:  Yes, Your Honor.  There is no mandatory

11    minimum penalty.  For each of the three counts, the maximum

12    penalty provided by law is up to 20 years in prison.  For

13    Count 1, there is a maximum fine of $250,000.  Counts 2 and 3,

14    the maximum fine is either $500,000 or twice the amount of the

15    proceeds involved in the offense, whichever is greater.

16          In addition to that, all the counts carry a maximum

17    penalty of three years of supervised release.

18          THE COURT:  All right.

19          Mr. Philossaint, the United States Sentencing

20    Commission has issued guidelines for judges to follow in terms

21    of sentencing in a criminal case; and have you and your

22    attorney had the opportunity to talk about how the sentencing

23    guidelines may apply to the charge that you're prepared to

24    plead guilty to; that is, Counts 1, 2 and 3 of the Indictment?

25          THE DEFENDANT:  Yes, Your Honor.

1    THE COURT:  And do you understand that your sentence

2   will be calculated pursuant to the sentencing guidelines, which

3   assigns a score to your offense and to your criminal history?

4    THE DEFENDANT:  Yes, Your Honor.

5    THE COURT:  Do you understand any estimate of the

6   sentence given to you by your attorneys or others is only an

7   estimate and that I will not determine the sentence until I

8   have reviewed a presentence investigation report?

9    THE DEFENDANT:  Yes, Your Honor.

10    THE COURT:  Do you understand that you will not be

11   allowed to withdraw your plea of guilty solely as a result of

12   the sentence that you receive?

13    THE DEFENDANT:  Yes, Your Honor.

14    THE COURT:  Do you understand that under some

15   circumstances, you or the Government may have the right to

16   appeal the sentence that I impose?

17    THE DEFENDANT:  Yes, Your Honor.

18    THE COURT:  Do you understand that I can depart or

19   vary from the sentencing guidelines and give you a sentence

20   that is higher or lower than the sentence given by the

21   sentencing guidelines?

22    THE DEFENDANT:  Yes, Your Honor.

23    THE COURT:  Do you understand that if I depart or vary

24   upward from the sentencing guideline, you may appeal the

25   sentence?

```
 1              THE DEFENDANT:  Yes, Your Honor.

 2              THE COURT:  Do you understand that if I depart or vary

 3    downward from the sentencing guidelines, you or the Government

 4    may appeal the sentence?

 5              THE DEFENDANT:  Yes, Your Honor.

 6              THE COURT:  Has it been explained to you that parole

 7    has been abolished in the federal system?  So if you were

 8    sentenced to prison, Mr. Philossaint, you would not be released

 9    early on parole, sir.

10              THE DEFENDANT:  Yes.

11              THE COURT:  All right.  Has anyone made any other or

12    different promise or assurance of any kind to you in an effort

13    to induce you to plead guilty in this case?

14              THE DEFENDANT:  No, Your Honor.

15              THE COURT:  Has anyone attempted in any way to force

16    you to plead guilty in this case?

17              THE DEFENDANT:  No, Your Honor.

18              THE COURT:  Has your lawyer done everything that you

19    have asked him to do regarding your case?

20              THE DEFENDANT:  Yes, so far.

21              THE COURT:  Is there anything that has not been done

22    in your case?

23              THE DEFENDANT:  Only the Count 4 that he's working on

24    to go to trial.  That's it, Your Honor.

25              THE COURT:  Yeah, but you're not pleading guilty to
```

```
 1   Count 4.
 2              THE DEFENDANT:  No.
 3              THE COURT:  All right.  So like I said, are you saying
 4   that everything has been completed and there's nothing left to
 5   view; is that correct?
 6              THE DEFENDANT:  Yes, Your Honor.
 7              THE COURT:  And do you understand that the offense for
 8   which you're pleading guilty is a felony offense?  That is, if
 9   your plea is accepted, you will be adjudged guilty of that
10   offense and that adjudication may deprive you of valuable civil
11   rights.
12              THE DEFENDANT:  Yes, Your Honor.
13              THE COURT:  It includes the right to vote, the right
14   to hold office, the right to serve on a jury and the right to
15   possess any type of firearm.
16              THE DEFENDANT:  Yes, Your Honor.
17              THE COURT:  Now, do you understand that if you
18   committed a crime from where you're pleading guilty before
19   you're naturalized, the court may initiate denaturalization
20   proceedings against you?
21              THE DEFENDANT:  Yes, Your Honor.
22              THE COURT:  All right.  Also, regardless of any
23   discussion or advice that you had or did not have with your
24   attorney or anyone else, are you pleading guilty of your own
25   free will because you are, in fact, guilty, sir?
```

1          THE DEFENDANT:  Yes, Your Honor.

2          THE COURT:  And by pleading guilty, Mr. Joff Stenn

3    Wroy Philossaint, I am now going to advise you of your

4    constitutional rights that you are waiving, or giving up, by

5    entering a plea of guilty.  They are as follows, so please

6    listen carefully as well:

7          Do you understand that you have a right to plead not

8    guilty to any of the offenses charged against you and to

9    persist in a plea through a trial?

10         THE DEFENDANT:  Yes, Your Honor.

11         THE COURT:  Do you understand that if you plead not

12   guilty, you would then have a right to have a trial by jury?

13         THE DEFENDANT:  Yes, Your Honor.

14         THE COURT:  Furthermore, do you understand that at a

15   trial, you would be presumed to be innocent and the Government

16   would have to prove that you are guilty of and to the exclusion

17   beyond every reasonable doubt?

18         THE DEFENDANT:  Yes, Your Honor.

19         THE COURT:  You would have the right to the assistance

20   of effective and competent counsel for your defense at trial

21   and at every other proceeding in this case.  And that includes,

22   if you need it, the right to have counsel appointed for you if

23   you cannot afford to hire a lawyer on your own.

24         THE DEFENDANT:  Yes, Your Honor.

25         THE COURT:  You would have the right to see and hear

1    all of the witnesses and the evidence brought against you.

2              THE DEFENDANT:  Yes, Your Honor.

3              THE COURT:  You would have the right to have the

4    witnesses and evidence confronted and cross-examined in your

5    defense.

6              THE DEFENDANT:  Yes, Your Honor.

7              THE COURT:  You would have the right to the issuance

8    of subpoenas, or the compulsory process, to compel the

9    attendance of witnesses and evidence for the promotion of your

10   defense.  Do you understand that, sir?

11             THE DEFENDANT:  Yes, Your Honor.

12             THE COURT:  You also have the right to decline to

13   testify, unless you voluntarily elected to do so in your

14   defense.  And if you decided not to testify, your silence could

15   not be used against you in any way and you would keep the

16   presumption of innocence.

17             THE DEFENDANT:  Yes, Your Honor.

18             THE COURT:  If you are convicted, you would have the

19   right to appeal your conviction.  Do you understand that as

20   well?

21             THE DEFENDANT:  Yes, Your Honor.

22             THE COURT:  Now, do you first understand, sir, if you

23   enter a plea of guilty, there will be no trial and that you

24   would've waived, or given up, your right to a trial, as well as

25   the other rights associated with a trial that I just described?

1          THE DEFENDANT:  Yes, Your Honor.

2          THE COURT:  All right.

3          Would the Government please set forth the factual

4    basis with regard to Count 1, 2 and 3?

5          MR. OSBORNE:  Yes, Your Honor.  The Government and

6    Mr. Philossaint and his attorney have signed a factual -- a

7    proffer, which we agree is truthful and meets the elements of

8    the offenses.  The Defendant also understands that the

9    Government may present evidence at future proceedings that his

10   criminal conduct was more extensive than I'm going to describe

11   at this time, Your Honor.  But this is -- these facts are

12   accurate and do meet the elements of the offense.

13         In the first case, Your Honor, this case involves the

14   Payroll Protection Program and the Economic Injury Disaster

15   Loan program.  Those programs are described in Paragraphs 1

16   through 9 of the general allegations of the superseding

17   Indictment, and the parties agree that those general

18   allegations accurately describe those programs.

19         Turning to the Defendant's conduct, beginning no later

20   than in or around May or June of 2020, and continuing through

21   no earlier than in or around June of 2021, Mr. Philossaint

22   assisted numerous conspirators to submit fraudulent

23   applications for PPP loans and EIDLs on behalf of businesses

24   owned and controlled by the conspirators.

25         At first, Mr. Philossaint carried out this scheme by

1    working for a company identified in the factual proffer as

2    Company 1, which was operated by Conspirator 1.  Later,

3    Mr. Philossaint began working for himself in carrying out the

4    same scheme.

5         Mr. Philossaint prepared loan applications for the

6    conspirator business owners and caused the applications to be

7    sent to his conspirators to digitally sign and electronically

8    submit to various financial institutions and to the Small

9    Business Administration.  The application contained material

10   misrepresentations about the businesses, such as substantial

11   overstatement of the businesses' gross revenues, the number of

12   employees and the average monthly payroll.

13        Based on the fraudulent applications, various private

14   financial institutions and the SBA loaned money, generally

15   hundreds of thousands of dollars, to the conspirator's

16   businesses.

17        Mr. Philossaint later prepared -- later prepared

18   applications on behalf of the conspirator businesses for

19   forgiveness of the PPP loans.  These applications falsely

20   stated that the businesses had met the preconditions of loan

21   forgiveness by using the loans to pay payroll and/or for other

22   permissible expenses.

23        Could I have a minute to consult with Defense counsel,

24   Your Honor?  I just see him reacting in a manner that suggests

25   there could be an issue.

1          THE COURT:  Sure.

2      (Pause in proceedings.)

3          MR. OSBORNE:  Thank you, Your Honor.  I'll continue.

4          Automatic Data Processing, Incorporated, also known --

5  or commonly known as ADP, provided payroll and other services

6  to other businesses.  Conspirator 1 and/or Mr. Philossaint

7  opened ADP accounts on behalf of their conspirators with

8  themselves, Conspirator 1 and Mr. Philossaint, as the account

9  administrators.  It caused ADP to make payments purportedly for

10 payroll to individuals with the loan proceeds.

11         Although these individuals either do not work for the

12 loan recipients or were not entitled to payroll in the amounts

13 paid, Mr. Philossaint attempted to obtain and use ADP records

14 to support the applications for loan forgiveness.

15         Brianna Monique Gayle, a codefendant in this case, had

16 previously worked for a subsidiary of ADP.  During the

17 conspiracy, she worked as an assistant for Mr. Philossaint.

18 Records obtained from ADP show that Gayle, while working for

19 Mr. Philossaint, contacted ADP on multiple occasions between

20 May 2021 and April 2022.

21         Ms. Gayle contacted ADP to manage payroll accounts

22 enrolled by one of the Defendant's businesses, such as adding

23 or removing accounts.  Ms. Gayle also contacted ADP to retrieve

24 payroll documents and W-2s for the payroll accounts.

25         Ms. Gayle called ADP on January 26, 2022, and

1  conferenced Mr. Philossaint into the call.  They stated that

2  their entire client list should have been terminated as going

3  out of business and, therefore, should have received W-2s for

4  2021.  Ms. Gayle continued to make calls to ADP on behalf of

5  the companies enrolled by the Defendant's business to obtain

6  W-2s.

7          Shortly after the conspirator business owners received

8  their loan proceeds, they paid either Conspirator 1 or

9  Mr. Philossaint a fee of approximately 10 percent of the value

10 of the loans.  In many cases, the fee was paid to shell

11 companies that Mr. Philossaint controlled, which did no true

12 business, or inaccurate notations were made on the checks or

13 other incidents of payment.  These payments were made from and

14 to financial institutions; that is, banks, the deposits of

15 which were insured by the Federal Deposit Insurance

16 Corporation.

17         Mr. Philossaint assisted codefendants and conspirators

18 to apply for fraudulent loans and apply for such loans himself.

19 The conspirators applied for loans on behalf of:  Ms. Gayle,

20 applying as a sole proprietor; The Cinda Foundation,

21 Incorporated; DDZ Family Enterprises, LLC; Ferro's

22 Entertainment and Production, LLC; JREAM Vision TV, LLC; One

23 Solution Group, LLC; Royal Elite Trans, LLC; Sunrise City

24 Construction Development, LLC; Unfold Perception, LLC, and

25 other businesses.

1    Based on these applications, lenders and the SBA paid

2    at least $2,020,328.17 in loans to which the conspirators were

3    not entitled.  The conspirators who received these loans paid

4    Mr. Philossaint approximately 10 percent of the value of the

5    loans.

6    The fraudulent PPP and EIDL applications involved in

7    this scheme were submitted electronically to servers located

8    outside of Florida.  Mr. Philossaint and most of the other

9    conspirators resided and worked in the Southern District of

10   Florida and submitted their applications from this district.

11   The applications for PPP loans submitted by Unfold

12   Perception, LLC, are a representative example of the scheme and

13   conspiracy.  Unfold Perception was a Florida limited liability

14   company.  It was organized on May 28th, 2019.  Codefendant

15   Regine Rene was the sole managing member.  Unfold's principal

16   place of business was in West Palm Beach, Florida.

17   On June 18, 2020, Unfold applied for a PPP loan.  The

18   loan application was digitally signed by Ms. Rene.  The

19   application was electronically submitted to Celtic Bank servers

20   which were located in Utah.  The application stated that Unfold

21   had three employees and average monthly payroll of $32,781.66.

22   For the 12 months preceding this application, records of

23   Unfold's bank account revealed that the company had gross

24   revenue of approximately $10,000 and no payroll.

25   A copy of an IRS Form 941, Employer's Quarterly Tax

Returns, was submitted with the application.  This form
appeared to corroborate the payroll figure on the application.
However, Unfold did not submit the form to the IRS.  Based on
this application, on June 22, 2020, Celtic Bank transferred a
PPP loan to Unfold's Wells Fargo bank account in the amount of
$81,954.

Trust Alliance Enterprises, Incorporated, was a
Florida corporation.  It was incorporated on June 15, 2020.
Conspirator 1 was the sole officer.  On June 25, 2020, Ms. Rene
signed a check from the Unfold bank account made out to Trust
Alliance Enterprises in the amount of $10,654.02.

On June 30, 2020, eight days after Unfold received its
PPP loan, a payroll account was created at ADP for Unfold.
Conspirator 1 was the primary contact.  From July through
December 2020, using proceeds of the PPP loan, Unfold paid
$49,172.24 in payments purportedly for payroll via ADP,
including $29,999.97 to Ms. Rene.

On February 22, 2021, Unfold applied for a second PPP
loan.  The application was electronically transmitted to Celtic
Bank's servers which were located in Utah.  The application
stated that Unfold had three employees, an average monthly
payroll of $32,781.  For the 12 months preceding this
application, Unfold had gross revenues of approximately
$24,000, not including the PPP and EIDL funds, and payroll of
$2,300, not including the ADP payments I just described.

1    A copy of the same IRS Form 941 that had accompanied

2    Unfold's previous application, which had not been submitted to

3    the IRS, was submitted with this new application.  Based on

4    this application, on February 23, 2021, Celtic Bank transferred

5    a PPP loan to Unfold's Wells Fargo bank account in the amount

6    of $81,952.

7         Dad Money Investment Group, LLC, and Elite

8    International Venture Capital, LLC, were Florida limited

9    liability companies.  They were both organized on July 6th,

10   2020.  Mr. Philossaint was the president of Dad Money.  Dad

11   Money was Elite International's sole managing member.  The

12   companies' principal places of business were two different

13   suites in the same office building in Hallandale Beach,

14   Florida.

15        On March 5, 2021, Ms. Rene signed a check from the

16   Unfold's Wells Fargo bank account made out to Elite

17   International Venture Capital in the amount of $5,597, which is

18   somewhat less than 10 percent of the amount of Unfold's second

19   PPP loan.  In the memo line of the check written was the word

20   "accounting."

21        On May 6th, 2021, Unfold opened a new ADP account.

22   Mr. Philossaint was the only authorized firm representative

23   listed on the account.  From May through August 2021, using

24   proceeds of the second PPP loan, Unfold paid $49,194.05 in

25   payments purportedly for payroll via ADP, including $30,044.28

to Ms. Rene.  The last payment was made on August 25, 2021.

On August 6th, 2021, Ms. Rene sent Mr. Philossaint a voice recording over WhatsApp.  She stated that she was, Wondering when is the last date of the payroll so that I can call them so they can pause it.  Please let me know.

On August 18, 2021, Ms. Rene wrote to Mr. Philossaint by WhatsApp, Please inform me of when the date payroll ends.  I believe it has been six months.  Law enforcement agents subsequently recovered these messages from Mr. Philossaint's phone.

On May 24, 2021, Unfold applied for forgiveness of its first PPP loan.  The application claimed that Unfold had three employees at the time of the application and that Unfold had spent $49,172.24 of the loan on payroll expenses.  As a result of Unfold's application, the loan was forgiven.

On September 8, 2021, Unfold applied for forgiveness of its second PPP loan.  The application claimed that Unfold had three employees at the time of the application and that Unfold had spent $49,761.07 of the loan on payroll expenses. As a result of Unfold's application, that loan was also forgiven.

I'll turn now, Your Honor, to the facts involved in Count 3.  Royal Elite Trans, LLC, was a Florida limited liability company.  Mr. Philossaint was the sole managing member.  Its principal place of business changed several times

but was always in Miami-Dade or Broward County, Florida.
Mr. Philossaint was the only signatory on Royal Elite Trans's
bank accounts.

On April 1, 2020, Royal Elite Trans applied for an
EIDL.  The application was electronically transmitted to the
servers of the Small Business Administration which were located
outside of Florida.  The application required Royal Elite Trans
to describe its detailed business activity.  The application
listed limousine and transportation as the detailed business
activity.

SBA initially declined the application, but
Mr. Philossaint requested reconsideration of that decision and
administratively appealed it and eventually the loan was
granted.

On December 16, 2021, Mr. Philossaint electronically
signed a loan authorization and agreement with the Small
Business Administration.  The agreement included the
requirement that borrow -- open quote -- begin quote, Borrower
will use all of the proceeds of this loan solely as working
capital to alleviate economic injury caused by disaster
occurring in the months of January 31, 2020, and continuing
thereafter.

On December 21, 2021, SBA transferred an EIDL to Royal
Elite Trans's Bank of America checking account in the amount of
$289,400.  Mr. Philossaint was the only signatory on this

account.

Royal Elite Trans had not, in fact, suffered economic injury in 2020.  Royal Elite Trans's bank records indicate that the company's gross revenue increased from 136,766.93 in 2019 to $237,755.07, excluding PPP and EIDL funds.  The records contain no indication that Royal Elite Trans operated a limousine or similar transportation business and no indication that Royal Elite Trans paid any significant business expenses.

An attorney's Interest on Trust Account is an interest-bearing trust account used by members of the Florida Bar to hold nominal or short-term funds in trust for a client or third party when it would not be feasible to earn income on the funds for the client or third party.  The income on an Interest on Trust Account benefits charitable causes designated by the Florida Bar.

Tollinchi Law, PA, was a Florida corporation engaged in the practice of law.  The sole officer was Mariel Tollinchi, a codefendant in this case.  Ms. Tollinchi was an attorney and was in a romantic relationship with Mr. Philossaint.  Tollinchi Law maintained an Interest on Trust Account at Chase Bank.

On December 22, 2021, two checks were written from the Royal Elite Trans account:  One for Tollinchi Law for $34,000 and the other to Ms. Tollinchi personally for $6,573.63.

On January 5, 2022, $26,371.30 was wired from Royal Elite Trans's Bank of America checking account to Tollinchi

Law's Interest on Trust Account.  On January 6, 2022, Tollinchi Law wired the same sum, $26,371.30, from the same account to an account in the Dominican Republic.  The notation associated with the wire read, Joff Philossaint real estate purchase.

On January 20, 2022, the same Royal Elite Trans account wired $190,000 to the same Tollinchi Law account.

On January 25, 2022, Tollinchi Law wired $200,000 from the same account -- that is, its Interest on Trust Account -- to an account in the Dominican Republic.  The notation associated with the wire included Joff Philossaint's name and the words "real estate."  Royal Elite Trans's bank records contained no indication that its business involved real estate transactions before it obtained its EIDL.

Before the EIDL, or Economic Injury Disaster Loan, was deposited in Royal Elite Trans's Bank of America account, the balance in the account was approximately $2,000.  Between the time of the deposit of that loan and the wire of January 20, 2022, that I've just described, the account received approximately $31,650 in deposits.  Therefore, Royal Elite Trans could not have transferred the funds to Tollinchi Law as described above without the Economic Injury Disaster Loan.

Wells Fargo, Bank of America and Chase Bank were financial institutions; that is, banks the deposits of which were insured by the Federal Deposit Insurance Corporation.

THE COURT:  All right.

1          Mr. Philossaint, did you hear what the Government has

2   said?

3          THE DEFENDANT:  Yes, Your Honor.

4          THE COURT:  And do you agree that it's a true and

5   correct statement of what the prosecutor has said?

6          THE DEFENDANT:  I have objections, Your Honor.

7          THE COURT:  All right.  What objections or changes

8   would you like to address?

9      (Pause in proceedings.)

10         MR. GOLDSTEIN:  Your Honor, if I may?

11         THE COURT:  Sure.

12         MR. GOLDSTEIN:  Two minor things.  On the top of the

13  second page on the factual proffer where it says, Was operated

14  by Conspirator 1.  Later, Philossaint began working for himself

15  in carrying out the same scheme, he is saying that he was

16  always working under Conspirator 1.  I don't think that that

17  has any effect on the -- on any of the elements of the crime.

18         THE COURT:  All right.

19         MR. GOLDSTEIN:  So we're asking to strike that.

20         THE COURT:  I won't strike it.  It will be a note --

21  it will be noted for the record, his objection to it.

22         MR. GOLDSTEIN:  Okay.  And finally, in Paragraph 26,

23  the Government makes reference to the Bank of America account

24  in which there were $2,039.50.  Mr. Philossaint would add that

25  he had actually three different accounts for that business, not

```
 1    just that one account.
 2              THE COURT:  All right.  Anything else?
 3              MR. GOLDSTEIN:  That's it, Your Honor.
 4              THE COURT:  All right.  Mr. Goldstein, do you -- or
 5    are you satisfied with your client's understanding of his
 6    rights and what he's giving up today?
 7              MR. GOLDSTEIN:  Yes, Your Honor.
 8              THE COURT:  And are you satisfied that there has been
 9    a sufficient statement, a factual basis, with regards to Count
10    1, 2 and 3 of the Indictment?
11              MR. GOLDSTEIN:  I do.
12              THE COURT:  All right.
13              Mr. Philossaint, how do you now plead to the charges
14    set fort in Counts 1, 2 and 3 of the Indictment?  Guilty or not
15    guilty?
16              THE DEFENDANT:  Guilty.
17              THE COURT:  It is the finding of this Court in this
18    case that the Defendant, Joff Stenn Wroy Philossaint, is fully
19    competent and capable of entering an informed plea and that
20    Joff Stenn Wroy Philossaint is aware of the nature of the
21    charges and the consequences of the plea based upon his
22    conversations with his attorney and the colloquy before the
23    Court and that the plea of guilty is a knowing, intelligent and
24    voluntarily plea supported by an independent basis in fact
25    containing each of the essential elements of the offense.
```

1          The Court finds that the plea presented to the Court

2     was voluntarily entered into and the plea was not entered as a

3     result of force, threats or coercion.  I also find that the

4     plea has been entered into with the advice and assistance of

5     effective and competent counsel.

6          The plea is, therefore, accepted.  And the Defendant,

7     Joff Stenn Wroy Philossaint, is now adjudged guilty of the

8     offense charged in Counts 1, 2 and 3 of the Indictment and a

9     judgment of guilty is now entered as to Counts 1, 2 and 3.

10          Mr. Philossaint, prior to sentencing, sir, a probation

11     officer will be contacting you to inquire about matters that

12     will be included in your PSI report, which is the presentence

13     investigation report.  And at that time, you will meet with the

14     probation officer.  Your attorney may be with you, if you wish.

15          And you will be given a copy of the report.  You will

16     have an opportunity of filing objections or requests associated

17     with it, and at your sentencing hearing, I will hear and decide

18     all of those matters.  And at that time, I should hear from

19     you, if you wish, to make a statement on your own behalf and

20     also from anyone else who wishes to come to court to talk to

21     you.

22          Do you understand that, Mr. Philossaint?

23          THE DEFENDANT:  Yes, Your Honor.

24          THE COURT:  All right.

25          Patricia, order the presentence investigation report

1    and set a sentencing date for Mr. Philossaint, please.

2            THE COURTROOM DEPUTY:  Yes, Judge.  Sentencing will be

3    Wednesday, January 25th, at 9 a.m.

4            THE COURT:  All right.

5            Did you hear what she said, Mr. Philossaint?

6            THE DEFENDANT:  Yes, Your Honor.

7            MR. GOLDSTEIN:  Your Honor, if I may.  We still have

8    the fourth count to try.

9            THE COURT:  Yes.

10            MR. GOLDSTEIN:  So we're going to do the sentencing

11    before the trial?

12            THE COURT:  Well, we don't know.  If he's acquitted,

13    it doesn't matter, right?

14            MR. GOLDSTEIN:  Right.  But if he's convicted --

15            THE COURT:  He can wait until the PSI perhaps comes

16    from that as well, if that's the case.

17            MR. GOLDSTEIN:  Okay.

18            THE COURT:  All right.  So I'll leave this subject to

19    the outcome of the case.  Right now, he's presumed innocent.

20    He's -- all right?

21            MR. GOLDSTEIN:  I agree.  This is one case I think it

22    should travel together.

23            THE COURT:  All right.  It depends what happens at the

24    trial, or we can adjust that, okay?

25            MR. GOLDSTEIN:  Okay.  May I address tomorrow's

```
1    calendar call briefly?

2              THE COURT:  Sure.

3              MR. GOLDSTEIN:  I know we're set for a phone calendar

4    call tomorrow.  We originally had a plea on all four counts, so

5    we joined in that motion to continue.  But I would join in it

6    to -- understanding that it's already been denied.  I am

7    starting a trial Wednesday before Judge Middlebrooks.

8              THE COURT:  Which one?  This Wednesday?

9              MR. GOLDSTEIN:  This Wednesday.  Yes, sir.

10             THE COURT:  Okay.  How long is that trial?

11             MR. GOLDSTEIN:  That -- I think it's probably going to

12   run four to five days.  So, you know, up into Thanksgiving.

13             THE COURT:  All right.  And if that's the case, we'll

14   address that and it won't be a problem.  So we have more than

15   one week to go try the case.

16             MR. GOLDSTEIN:  We are not.  Okay.

17             THE COURT:  All right.

18             MR. GOLDSTEIN:  I just wanted to make sure.

19             THE COURT:  Okay.

20             MR. GOLDSTEIN:  All right.  Thank you, Your Honor.

21             THE COURT:  All right.  Is there anything else from

22   the Government we need to hear?

23             MR. OSBORNE:  No.  Thank you, Your Honor.

24             THE COURT:  All right.  Have a good day.

25             MR. GOLDSTEIN:  Thank you, Your Honor.
```

```
1              THE COURT:  Also, Mr. Goldstein, your case is

2    definitely going to trial with Mr. Middlebrooks, or you don't

3    know?

4              MR. GOLDSTEIN:  Yes, Your Honor.  It's a two-defendant

5    case.  The defendants just turned down a misdemeanor plea

6    and --

7              THE COURT:  Okay.

8              MR. GOLDSTEIN:  -- I'll be going to trial.

9              THE COURT:  When trying misdemeanors, I've had cases

10   go to trial too, so I've had my share.  I get it.

11             MR. GOLDSTEIN:  It's not getting any better than that,

12   and the Defendants have rejected that offer, so we totally

13   expect to pick a jury on Wednesday.

14             THE COURT:  All right.  Fine.  Thank you.

15             MR. OSBORNE:  Thank you, Your Honor.  Thank you,

16   Judge.

17             THE COURT:  Thank you.

18        (The proceedings concluded at 12:52 p.m.)

19

20

21

22

23

24

25
```

<u>**C E R T I F I C A T E**</u>

I hereby certify that the foregoing is an accurate transcription of the proceedings in the above-entitled matter.

_01/15/2023_
    DATE

STEPHANIE A. McCARN, RPR
Official United States Court Reporter
400 North Miami Avenue, Thirteenth Floor
Miami, Florida 33128
(305) 523-5518